UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| RICHARD W.  GORDON and | ) | |
| MARY J.  GORDON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:04cv155 |
| | ) | |
| OFFICER KAREN J.  WHITTED, SGT. | ) | |
| FRANCIS, DET.  HUSTON, SGT.  SISSON | ) | |
| and THE CITY OF MARION | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants

on February 25, 2005.  The plaintiffs responded to the motion on April 26, 2005, to which the

defendants replied on May 10, 2005.

For the following reasons, the motion for summary judgment will be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary

judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party

contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses.  Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous

cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

<u>Discussion</u>

A drive-by shooting occurred at 30th Street and Adams Street in Marion, Indiana, on April 20, 2003 at approximately 2:00 p.m.  Officer Karen J.  Whitted ("Officer Whitted") of the Marion Police Department responded to a call of shots fired in the area of 30th Street and Adams Street.  Other officers who responded to the call provided a description of the suspect vehicle as being a gray vehicle.  Officer Whitted proceeded to the McClure gas station parking lot at 30th Street and Adams street and spoke with two witnesses to the drive-by shooting, Yvonne Brown and Hattie Weaver.  Officer Whitted obtained tape-recorded statements from both Brown and Weaver.  Brown indicated that after she heard pops that sounded like firecrackers, she saw the passenger in a gray vehicle pointing a weapon out the passenger window, firing shots at a white van.  Brown described the weapon as an automatic weapon.  Weaver stated that she also heard shots and that she observed two black males in the front seat of a gray car and passengers in the back seat.  Weaver told Officer Whitted that the driver of the gray vehicle was shooting an automatic weapon by holding it over the top of the car and that the passenger also had an automatic weapon which he held outside the passenger side window.

Officer Alex Kenworthy ("Officer Kenworthy") of the Marion Police Department interviewed the purported victims of the drive-by shooting, DeCarlos Bledsoe and Angelica Galvan.  Bledsoe indicated that he was stopped at a red light on 30th Street and Adams when a gray car pulled up to the left rear side of his vehicle.  Bledsoe looked in his rearview mirror and

4

observed James McCreary, Thabit Gault and Nadar Davis ("Davis") pointing guns at his vehicle. Three individuals began shooting and Bledsoe sped off.  On April 21, 2003, Officer Kenworthy showed Bledsoe photo arrays and Bledsoe picked Dante Fauce, James McCreary, Thabit Gault, and Davis out of the photo arrays as the individuals who fired shots at his vehicle.

Officer Kenworthy also retrieved two spent rounds of ammunition from the rear of Bledsoe's vehicle.  Officer Kenworthy prepared a report summarizing the results of his investigation and determining that McCreary, Gault, Fauce, and Davis "knowingly, intentionally or recklessly performed an act (pointing and shooting guns) that created a substantial risk of bodily injury to DeCarlos Bledsoe and Angela Galvan.  It is a Class D felony due to the suspects being armed with deadly weapons."

On April 24, 2003, Officer Whitted received a telephone call from Officer Kenworthy requesting her assistance in conducting further investigation into the drive-by shooting.  Officer Kenworthy requested that Officer Whitted contact the witnesses to the shooting to clarify which passenger in the suspect vehicle was seen shooting at the victim's vehicle.  The witness clarified that the shooters were the driver and the front seat passenger of the suspect vehicle.  Officer Whitted provided the supplemental information to Grant County Deputy Prosecutor Rodney Faulk.

At approximately 11:15 a.m. on April 24, 2003, Officer Whitted met with Deputy Prosecutor Faulk who informed her that the Grant County Prosecutor wanted to obtain arrest warrants for the driver of the suspect vehicle, Gault, and the front seat passenger, Davis, on charges of attempted battery with a deadly weapon, a Class C felony.  Deputy Prosecutor Faulk also explained to Officer Whitted that he wanted to obtain search warrants for Davis at 1708

South Adams Street and Gault at 1714 South Washington Street.

Also on April 24, 2003, the Grant County Prosecutor's Office contacted Sergeant Rick Francis ("Sgt. Francis") and requested his assistance in driving by 1708 South Adams Street and 1714 South Washington Street to obtain physical descriptions of the residences for the search warrants. Sgt. Francis, who has known Davis since the early 1990s, always knew 1708 South Adams Street to be where Davis lived. Sgt. Francis arrested Davis in the past and knew that he lived with his grandparents, Mary Gordon and Richard Gordon (the plaintiffs), at 1708 South Adams Street. In addition, Sgt. Francis investigated Davis on narcotics sales at the South Adams street address in 1997 or 1998 when Sgt. Francis was a member of the Joint Effort Against Narcotics Team, the JEAN Team.

The Gordons have resided at 1708 South Adams Street since 1980. Davis has at times resided with his grandparents. Davis lived with his grandparents continuously from age 7 until age 16. According to the plaintiffs, Davis was sent to prison while he was in high school and has not lived with them since.[1]

In 2002, Davis stopped by a local business owned by Sgt. Francis, Karma Music, and wanted to talk to Sgt. Francis. Sgt. Francis indicated that he was busy and asked Davis if he was "Still at grandma's?". Davis responded affirmatively. Sgt. Francis also reviewed Davis' records from the Bureau of Motor Vehicles. Those records continuously listed Davis' address at 1708 South Adams Street. In addition, records from the Grant County Jail also showed Davis' address as 1708 South Adams Street.

---

[1] A search of the Indiana Department of Corrections website reveals that Davis was convicted in Grant County in 1994 of "possession of cocaine or narcotic drug", a Class C felony. Davis was released from prison on September 7, 1995.

As a result of his prior dealings with and investigations of Davis, Sgt. Francis was aware that Davis had weapons at the 1708 South Adams address. Sgt. Francis was also aware that Davis was a suspect in the April 20, 2003 drive-by shooting. This information, coupled with his prior information that Davis maintained weapons in the residence, led Sgt. Francis to the conclusion that issuance of a no-knock warrant was justified. However, the ultimate decision to seek a no-knock search warrant was made by the Grant County Prosecutor's Office.

At approximately 11:45 a.m. on April 24, 2003, an oral probable cause hearing was held in Grant Superior Court 1 before the Honorable Jeffrey D. Todd ("Judge Todd"). Officer Whitted and Sgt. Francis testified at the oral probable cause hearing. Officer Whitted testified that the shooting incident at 30th Street and Adams Street involved Bledsoe and his girlfriend. Bledsoe was operating a white Chevy Astro van eastbound on 30th Street approaching Adams Street. A gray vehicle approached Bledsoe's vehicle and individuals in the gray vehicle began firing rounds towards Bledsoe's van. The gray automobile was operated by an African-American male with one African-American male passenger in the front seat and possibly African-American males in the back passenger seat. Officer Whitted testified that the driver of the suspect vehicle was believed to be Gault and that he fired a weapon outside of his window. Davis was believed to be the front seat passenger and he fired a weapon through the passenger window towards the Bledsoe vehicle. Officer Whitted testified that Bledsoe named Gault as the driver and Davis as the passenger of the gray vehicle and that both individuals fired weapons at him. Officer Whitted also testified that Bledsoe believed Gault and Davis fired automatic weapons, and that shell casings were found near the scene of the incident. Officer Whitted also testified that Bledsoe believed that Gault and Davis were attempting to kill him.

Sgt.  Francis testified at the oral probable cause hearing that based upon his personal knowledge and information received from other officers, Davis resided at 1708 South Adams Street in Marion, Indiana.  Sgt.  Francis described the residence at 1708 South Adams Street. Sgt.  Francis indicated that based upon the facts presented at the oral probable cause hearing, and his years of service on the Marion Police Department, he was requesting the issuance of no-knock warrants for Gault and Davis.  Sgt.  Francis testified that as a member of the Marion Police Department and as a member of the JEAN Team Drug Task Force, he had been to both residences in the past.  Davis' residence at 1708 South Adams Street was known to Sgt.  Francis as being a place where weapons were present and where drug trafficking occurred.

After hearing the testimony of Officer Whitted and Sgt.  Francis, Judge Todd determined that probable cause existed for the issuance of a no-knock arrest warrant and a no-knock search warrant.  The no-knock search warrant issued for 1708 South Adams Street reads as follows:

> TO OFFICER KAREN WHITTED of the MARION POLICE DEPARTMENT
> and/or any other law enforcement officer.
>
> Whereas there has been presented before me the sworn testimony of Officer Richard Francis this 24th day of April, 2003, and such testimony containing such officer's belief that there are certain items, to-wit:
>
> 1708 SOUTH ADAMS STREET, MARION, INDIANA FOR GUN(S) AND/OR HIS PERSON
>
> and that the above described items are unlawfully possessed and subject to seizure because property(s) may be evidence of a crime contained thereon [sic].
>
> The reasons and grounds for Affiant's belief that there is probable cause for searching said [sic] are as follows:
>
> See transcript of oral probable cause hearing before the Honorable Jeffrey D. Todd on April 24, 2003.

(Defendants' Exhibit B).

An arrest warrant for Davis was also issued on April 24, 2003 on charges of attempted battery with a deadly weapon, a Class C felony.  The arrest warrant lists 1708 South Adams Street as Davis' address.  (Defendants' Exhibit C).

Officer Whitted proceeded to 1708 South Adams Street to assist in the search.  Officer Whitted entered the residence after members of the Marion Police Department Emergency Response Team ("ERT") entered the residence.  Officer Whitted did not personally activate a flash grenade or other distracting device at the residence.  Detective Dennis Huston ("Det. Huston") and Sergeant Tom Sisson ("Sgt.  Sisson") of the Marion Police Department also assisted in the execution of the search warrant.  Both of them entered the home after the ERT.  Neither of them activated a flash grenade or other distracting device at 1708 South Adams Street.  Davis was not found at the home.

Sgt.  Francis did not personally participate in the search.  According to the defendants, neither Officer Whitted, Det.  Huston nor Sgt.  Sisson removed property from the home nor caused any damage to the outside of the residence or to property in the residence.

The Gordons acknowledge that at the time of the search of their home, they continued to periodically receive mail addressed to Davis at their address.  In fact, when Sgt.  Francis arrived at the residence on April 24, 2003, he observed a stack of mail addressed to Davis sitting on the porch at the back of the house.  Mary Gordon has acknowledged that there was a stack of mail addressed to Davis near the back door of the residence.

When Mary Gordon returned home from work on April 24, 2003, the alley behind her house was blocked off with yellow ribbons and there was an officer standing at the back door who would not let her in the residence.  Mary Gordon observed officers walking around her

house.  One of the officers indicated that they had a warrant and were searching for drugs and

firearms.  While Mary Gordon claims that none of the officers informed her who or what they

were looking for in the house, she informed the officers that Davis did not live there.

On April 23, 2004, the Gordons filed a § 1983 action against the defendant officers and

others.  The Gordons allege that the search of their home violated their Fourth Amendment

rights.  The Gordons also allege that the defendants' conduct constituted trespass, invasion of

privacy, conversion, theft, and outrageous conduct causing emotional distress.  The Gordons

further allege that siding to their home was damaged during the search by a flash grenade device

and that damage was done to the doors of the home during the entry.  The Gordons also claim

that personal property and money was missing after the search.

The defendants now seek summary judgment on all claims.  In support of their motion,

the defendants first assert that Officer Whitted and Sgt.  Francis did not misrepresent or fabricate

evidence in connection with the investigation of the drive-by shooting and the oral probable

cause hearing.  In their complaint, the Gordons allege that Davis did not live at their home at

1708 South Adams Street and that Officer Whitted and Sgt.  Francis "provided false testimony to

intentionally cause the judge to issue the warrant and based upon misrepresentation of fabricated

evidence, all of which caused the Court to issue the warrant, a 'no knock' search warrant. . . ."

(Complaint at ¶ 3).

Police officers can justify a no-knock entry if they show they had a reasonable suspicion

that knocking and announcing their presence under the particular circumstances would threaten

officer safety, be futile, or inhibit the investigation of the crime.  Richards v.  Wisconsin, 117

S.Ct.  1416, 1421 (1997).  A no-knock warrant is permissible if a suspect's "possession of

10

firearms posed a threat to the safety of the officers."  United States v.  Singer, 943 F.2d 758, 763 (7ᵗʰ Cir.  1991).  "Where a warrant applicant gives reasonable grounds to . . . suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a 'no-knock' entry."  United States v.  Banks, 124 S.Ct.  521 (2003).

It is undisputed that the Gordons' claim is governed by the stringent standard established by the Supreme Court in Franks v.  Delaware, 98 S.Ct 2674 (1978).  As a general proposition, there is a presumption of validity with respect to an affidavit supporting a warrant and information provided to a Court to support issuance of a warrant.  Molina v.  Cooper, 325 F.3d 963, 968 (7ᵗʰ Cir.  2003).  A plaintiff seeking to overcome the presumption of validity and invalidate the warrant must present evidence that the officer making the affidavit or testifying before a Court knowingly or intentionally, or with reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed for issuance of the warrant.  Franks, 98 S.Ct. at 2676.  In Beauchamp v.  City of Noblesville, Indiana, 320 F.3d 733, 743 (7ᵗʰ Cir.  2003), the Seventh Circuit Court of Appeals held that "a reckless disregard for the truth is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause."

The defendants argue that in the present case, there is no evidence that Officer Whitted or Sgt.  Francis made false statements to Judge Todd or demonstrated reckless disregard for the truth with respect to the statements made to Judge Todd during the oral probable cause hearing.

11

Officer Whitted's investigation provided her with information that Davis was one of the individuals in the gray automobile that fired shots at the Bledsoe vehicle.  Thus, argue the defendants, Officer Whitted possessed sufficient facts to establish that (1) Davis was one of the individuals involved in the drive-by shooting and (2) Davis was in possession of a (possibly automatic) firearm.  The Gordons have made no challenge to this evidence.

The defendants next point out that the Gordons have presented no evidence, other than their self-serving assertions, that Davis did not live with them.  Thus, the defendants argue that the Gordons cannot demonstrate that Sgt.  Francis provided false information to Judge Todd, or acted in reckless disregard for the truth.  The defendants reiterate that for many years, Sgt. Francis personally knew that Davis resided at 1708 South Adams Street.  Additionally, Davis' driver's license listed his address at all times as 1708 South Adams Street.  Finally, jail records always listed Davis' address at 1708 South Adams Street.

In response, the Gordons assert that if the officers had done a more thorough investigation, they would have discovered that Davis did not live at 1708 South Adams Street. The Gordons claim that the officers were relying on old information and that even though the officers might have been correct that Davis lived with them in 1997 or 1998, they had no up-to-date information about his address.   However, the Gordons have failed to submit even one piece of documentation showing that Davis lived somewhere else.  The Gordons claim that Davis was married in Indianapolis in the summer of 2002, and that after that date, because he was on probation,  he was ordered by the Grant County Superior Court to obtain residency.  The Gordons argue that if the officers had searched through Davis' criminal files in the Grant County Courthouse, they would have seen that Davis had been ordered to obtain residency, and would

12

have concluded that Davis did not live at the Gordons' home.  Again, however, there is no evidence that there is a record anywhere telling the officers that Davis had a new address, if that is in fact the truth.  Thus, the court fails to comprehend how a further investigation by the officers would have led them to any address other than 1708 South Adams Street.  In any event, neglecting to search every court file involving Davis is, at most, negligence on the part of the officers and negligence does not satisfy the demanding Franks standard.

The Seventh Circuit has held that mere negligence or a mistake in providing information in support of a warrant does not establish the requisite reckless disregard for the truth required under Franks.  In United States v.  A Residence Located at 218 Third Street, 805 F.2d 256, 258 (7th Cir.  1986), the Court held that "the standard of reckless disregard for the truth used in evaluating a challenge to a search warrant under Franks is analogous to the standard used in the context of First Amendment cases involving libel articulated by the Supreme Court in the landmark case of New York Times Co.  v.  Sullivan, 376 U.S. 254, 84 S.  Ct.  710, 11 L.Ed.2d 686 (1964)."  An officer providing information to support issuance of a warrant acts with reckless disregard for the truth where he "in fact entertained serious doubts as to the truth of his allegations."  805 F.2d at 258.  Reckless disregard for the truth may also be established inferentially "from circumstances evincing obvious reasons to doubt the veracity of the allegations."  Id.  However, "mere negligence by the affiant does not constitute reckless disregard for the truth."  Id.

As the defendants point out, the evidence in the present case does not show that Sgt. Francis in fact had serious doubts as to his statements to the Court that Davis' address was 1708 South Adams Street.  To the contrary, his statements to the Court were based upon his personal

13

knowledge as well as his review of BMV records and Grant County Jail records prior to testifying at the oral probable cause hearing.  In addition, the Gordons have not come forward with any evidence tending to show that Sgt.  Francis had any reason to doubt the veracity of the information he provided to the Court during the oral probable cause hearing.[2]

This court agrees that the Gordons have not made any showing that there were knowing or reckless falsehoods made by either Officer Whitted or Sgt.  Francis at the oral probable cause hearing and, therefore, the search and arrest warrants are entitled to a presumption of validity. Summary judgment will be granted in favor of the defendants on this issue.

The defendants next argue that Det.  Huston and Sgt.  Sisson are entitled to quasi-judicial absolute immunity.  The Gordons have filed suit against Det.  Huston and Sgt.  Sisson because they participated in executing the search warrant.  It is undisputed that neither Det.  Huston nor Sgt.  Sisson were involved in the warrant application process which led to the issuance of the search warrant, nor did they participate at the probable cause hearing.  Thus, the defendants argue that Det.  Huston and Sgt.  Sisson are entitled to quasi-judicial absolute immunity, as they were carrying out a valid court order.

In Henry v.  Farmer City State Bank, 808 F.2d 1228, 1238-39 (7th Cir.  1986), the Seventh Circuit held that police officers who execute valid court orders are entitled to quasi-

---

[2] In the absence of vindictiveness, which is not even alleged in the present case, common sense would dictate that if the officers doubted that Davis lived at 1708 South Adams Street they would have continued the investigation until they knew his present address (if he had one).  The officers were attempting to take a suspected violent criminal off the street and confiscate a gun or guns used in a drive-by shooting.  The record indicates that they were attempting to accomplish this goal as quickly as possible.  It is incongruent to suppose that they would have fabricated a story about Davis' address, and then wasted time and resources executing a search warrant at a residence they knew would leave them empty-handed.

14

judicial absolute immunity from liability for damages in civil rights actions challenging the conduct authorized by the court order.  Numerous other federal courts have held that police officers who act in reliance upon a facially valid court order are entitled to quasi-judicial immunity from suit for damages under § 1983.  See e.g., Martin Valdez v.  City and County of Denver, 878 F.2d 1285 (10th Cir.  1989)(peace officers who enforced a state court's contempt order were absolutely immune from damages under § 1983); Coverdell v.  Department of Social & Health Services, 834 F.2d 758, 764 (9th Cir.  1987)(children services worker who apprehended a child pursuant to a valid court order was entitled to absolute quasi-judicial immunity for executing the order); Tymiak v.  Omodt, 676 F.2d 306, 308 (8th Cir.  1982)(sheriff acting pursuant to state court order was immune from § 1983 suit for damages); Tarter v.  Hury, 646 F.2d 1010, 1013 (5th Cir.  1981)(county clerk is entitled to absolute immunity from actions for damages arising from acts that they are specifically required to perform under court order or at judge's direction); Slotnick v.  Garfinkle, 632 F.2d 163, 166 (1st Cir.  1980)(sheriff protected by immunity of judges under whose orders he acted); Kermit Construction Corp.  v.  Banco Credito Y Ahorro Ponceno, 547 F.2d 1, 3 (1st Cir.  1976)(receiver who faithfully and carefully carries out orders of judge shares judge's absolute immunity to prevent receiver from becoming a lightning rod for harassing litigation aimed at judicial orders).

In response, the Gordons claim, without citation to authority, that their belief that the court order was obtained under "false pretenses" strips Det.  Huston and Sgt.  Sisson of any immunity to which they would otherwise be entitled.  However, it is clear that the warrants were validly issued (i.e., issued by a judge), and thus the officers were required to execute the warrants.  It is irrelevant that the warrants may be challenged at a later date for lacking probable

cause or suffering from some other defect.  When an order or warrant is issued, and is facially valid, an officer obviously may not take it upon himself or herself to determine whether all the events underlying the order or warrant are one hundred percent accurate.  To permit or require this second-guessing would stall a vast portion of the court system.

The Gordons also argue that the "vicarious liability" of Det.  Huston and Sgt.  Sisson is established because these officers took an active part in the group action which resulted in their deprivation.   The Gordons rely on several cases in support of their proposition: <u>Gutierrez-Rodriguez v.  Cartagena</u>, 882 F.2d 553, 561 (1st Cir.  1989); <u>Chuman v.  Wright</u>, 76 F.3d 292, 294 (9th Cir.  1996); <u>James v.  Sadler</u>, 909 F.2d 834, 837 (5th Cir.  1990).  As the defendants point out, these cases are inapplicable to the present case as they all pertain to warrantless searches and warrantless arrests.  Moreover, the Gordons also incorrectly state the holding in <u>Chuman</u>.  In <u>Chuman</u>, the Court actually held that there is no "team effort" liability under § 1983 and that each defendant may be held liable only for the constitutional violations he commits.  The Ninth Circuit Court of Appeals held that it was reversible error for the District Court to instruct the jury that an individual police officer could be held liable for his "team effort" in executing a search warrant even if the individual officer was himself guilty of no constitutional violation.  The Court held that a "team effort" approach impermissibly allowed the jury to "lump all the defendants together, rather than to require it to base each individual's liability on its own conduct."  76 F.2d at 295.

The defendants next argue that, even if this court determines that questions of fact exist as to whether it was appropriate to search the Gordons' home for Davis, or for the issuance of the no-knock warrant, all of the defendants remain entitled to summary judgment under the

doctrine of qualified immunity.

Qualified immunity shields state actors from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 102 S.Ct. 2727 (1982). The qualified immunity defense allows for errors in judgment and protects "all but the plainly incompetent or those who knowingly violate the law . . . . If [officers] of reasonable competence could disagree on the issue, immunity should be recognized." Malley v. Briggs, 106 S.Ct. 1092 (1986). State actors are entitled to qualified immunity for their official actions if "a reasonable officer could have believed [the action taken was] lawful, in light of clearly established law and the information the officer possessed." Estate of Starks v. Enyart, 5 F.3d 230, 233 (7th Cir. 1993). The purpose of qualified immunity is to allow for reasonable errors, "because officials should not err always on the side of caution because they fear being sued." Humphrey v. Staszek, 148 F.3d 719, 727 (7th Cir. 1998).

In resolving a qualified immunity issue, the court must ask two questions. The threshold question is whether the facts, viewed in the light most favorable to the plaintiffs, show that the defendants' conduct violated a federal constitutional or statutory right. Saucier v. Katz, 121 S.Ct. 2151 (2001). If the plaintiff's submission demonstrates that the defendants could have violated a constitutional or statutory right, then "the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." Id.

"That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in

their individual capacities." <u>Fox v. Holston</u>, 94 F.3d 1528, 1532 (11th Cir. 1996). Under the

doctrine of qualified immunity, "officials are not liable for bad guesses in gray areas: they are

liable for transgressing bright lines." <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992).

<u>See also</u> <u>Mitchell v. Forsyth</u>, 105 S.Ct. (1985)(officials are immune unless "the law clearly

proscribed the actions" taken); <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1557 (11th Cir.

1993), <u>modified</u>, 14 F.3d 583 (11th Cir. 1994).

The defendants contend that the Gordons cannot establish that any of the defendants

violated their constitutional rights because sufficient probable cause existed for issuance of the

no-knock search warrant and there was a valid warrant for Davis' arrest. The defendants further

contend that even if the Gordons can establish a constitutional violation, qualified immunity

remains appropriate under the second prong of the <u>Saucier</u> analysis because all of the

defendants' conduct was objectively reasonable. The defendants argue that the Gordons cannot

demonstrate that no reasonable officer would have believed it was unconstitutional to enter the

residence where (1) a valid search warrant existed, (2) all evidence indicated that Davis lived at

1708 South Adams Street and (3) Davis was suspected of participating in a drive-by shooting.

In response, the Gordons claim that the manner in which the search warrant was executed

violated their clearly established constitutional rights. The Gordons claim that the defendants

acted maliciously, arbitrarily or capriciously in conducting a search pursuant to the warrant. The

Gordons point out that the ERT officers set off a flash grenade on the outside of the house,

causing damage to the siding, claiming that this noisy device defeated the purpose of the no-

knock warrant. The Gordons also reiterate their claims that the officers broke wooden

wastebaskets by standing on them and searched through jewelry even though they were

18

supposedly searching for guns.  The Gordons claim that their home was damaged and their personal property was stolen.

With respect to any argument that the Gordons may be making in regards to the defendants' decision to enter the residence at 1708 South Adams Street, it is clear that even if the Gordons could establish a constitutional violation (such as lack of probable cause), they have not made any showing that no reasonable officer would have believed it was unconstitutional to enter the residence where a valid search warrant existed, all evidence indicated that Davis lived at 1708 South Adams Street and Davis was suspected of participating in a drive-by shooting.

With respect to the Gordons' claim that the defendants destroyed their property, it is clear that minor damage to property does not rise to the level of a constitutional violation.  Signorile V. City of New York, 887 F. Supp. 403, 421 (E.D.N.Y. 1995).  In any event, the Gordons have filed a tort claim with the City of Marion for recovery of damages related to the alleged property damage.  (Complaint, Exhibit A).

Moreover, it is undisputed that none of the defendants named in the present complaint used a flash grenade.  Entry to the home, which damaged the doors, was made by the Grant County Emergency Response Team, who are not defendants in this case.  Defendant Sgt. Francis did not participate in the search, so he cannot be held liable for any of the alleged property damage.   Finally, Officer Whitted, Sgt. Sisson and Det. Huston state in their affidavits that they did not damage any property or remove any property during the course of the search. Thus, the defendants correctly argue that because there is no evidence that any of the individual defendants personally participated in removing or destroying the Gordons' property, the element of personal involvement that is a prerequisite to liability under § 1983 is lacking as to each

individual defendant in regards to these claims.  <u>Hildebrandt v.  Illinois Department of Natural Resources</u>, 347 F.3d 1014, 1034 (7th Cir.  2003); <u>Rascon v.  Hardiman</u>, 803 F.3d 269, 273 (7th Cir.  1995).  Accordingly, this court finds that the defendants are entitled to qualified immunity.

The court will next address the Gordons' state law claims.  The Gordons assert a state law claim for the tort of outrageous conduct arising from the execution of the search warrant, claiming that execution of the search warrant caused them emotional distress.   Under Indiana law, where "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another", that person is subject to liability for such emotional distress.  <u>Higgenbottom v.  Keithley</u>, 103 F.  Supp.2d 1075, 1089 (S.D. Ind.  1999); <u>Cullison v.  Medley</u>, 570 N.E.2d 27, 31 (Ind.  1991).  "It is the intent to harm one emotionally that constitutes the basis for the tort of intentional infliction of emotional distress."  <u>Higgenbottom</u>, 103 F.Supp.2d at 1089.  In addition to proving intent to harm, the Gordons must show that the defendants' conduct was "extreme and outrageous".  The conduct at issue must be "beyond all bounds of decency", regarded as "atrocious," and be "utterly intolerable in a civilized community".  <u>Van Jelgerhuis v.  Mercury Finance Co.</u>, 940 F.  Supp.  1344, 1369 (S.D. 1996).  Liability for the tort of outrageous conduct does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  <u>Gable v.  Curtis</u>, 673 N.E.2d 805, 809 (Ind.Ct.  App.  1996).

The defendants argue that, in the present case, the alleged conduct simply does not rise to the level of outrageousness necessary for the Gordons to survive summary judgment.  This court agrees with the defendants.  There is no evidence that the defendants had any intent to harm the Gordons in any way, physically or emotionally.  While it is undoubtedly distressing to arrive

20

home and find that police officers have broken into your house and ransacked the contents looking for guns or other illegal items, it is clear that the intent of the actions taken in this case was to protect the public (and the officers involved) and not to cause any specific harm to the homeowners.  Additionally, there is no evidence whatsoever that the conduct complained of was outrageous.  Rather, the conduct has all the earmarks of a routine criminal investigation and execution of a search warrant.  The crime underlying this civil action was a very serious crime, and warranted the action taken.  If Davis had been suspected of shoplifting rather than being a participant in a drive-by shooting involving automatic weapons, the defendants' conduct would seem rather extreme.  But in the context of the underlying crime and risks involved, it is abundantly clear that the defendants' conduct was not outrageous.

In any event, with respect to the outrageous conduct claim and the other state law tort claims (trespass, invasion of privacy, conversion, theft and infliction of emotional distress), the defendants are entitled to the protection of law enforcement immunity pursuant to I.C. 34-13-3(8).  This statute provides that a governmental entity or an employee acting within the scope of the employee's employment are immune from liability if a loss results from, "the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment."

The scope of "enforcement of law" under Indiana law includes those activities in which governmental employees "compel or attempt to compel the obedience of another to laws, rules, regulations, or sanction or attempt to sanction a violation thereof."  Mullin v. Municipal City of South Bend, 639 N.E.2d 278, 283 (Ind. 1994).  Law enforcement immunity exists even if the officer's conduct was intentionally tortious or egregious and contrary to law.  City of Anderson

21

v. Davis, 743 N.E.2d 359, 365 (Ind.Ct.App. 2001). As the defendants assert, the conduct of the defendants in the present case (executing a search warrant) is conduct undertaken to enforce the law. Consequently, each of the defendants are entitled to law enforcement immunity and will be granted summary judgment on the state law claims.

Conclusion

Based on the foregoing, the defendants' motion for summary judgment is hereby GRANTED.

Entered: May 27, 2005.

s/ William C. Lee
William C. Lee, Judge
United States District Court